IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GORDON CARRUTH, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. _____ |
| | § | |
| LONE STAR COLLEGE SYSTEM, | § | |
| | § | |
| *Defendant.* | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Gordon Carruth files this Original Complaint against Lone Star College System (sometimes referred to as "College") and in support shows as follows:

## I.
### SUMMARY

1.1     This lawsuit asserts claims for First Amendment Retaliation, violations of the Due Process Clause of the United States Constitution, breach of employment contract and conversion. For almost 20 years, Plaintiff Gordon Carruth taught Computer Information Technology for Lone Star College System. On October 9, 2012, just a few weeks after he had executed a two-year employment contract, the College precipitously and unlawfully fired Mr. Carruth.

1.2     Mr. Carruth's firing was unlawful in several independent ways and was the most recent example of the College violating federal and state law, failing to honor contracts, failing to adhere to its own rules, policies and procedures and retaliating against those who advocate a return to what the College once was—an institution about which Texans could be proud. Regrettably, the College's Montgomery campus is so bereft

of leadership that it has deteriorated into a McCarthyesque environment in which faculty members have two choices: stay employed by remaining silent or speak up about administrators' unlawful conduct and become unemployed. Because he has experienced the latter, Mr. Carruth now seeks justice, reinstatement and everything he has lost as a consequence of his unlawful firing. Change and accountability are necessary at the highest levels of College administration, and this lawsuit is filed to illuminate the reasons why in furtherance of those objectives.

## II.
### JURISDICTION AND VENUE

2.1     Jurisdiction of Plaintiff's claims for First Amendment retaliation and for violation of the due process clause are conferred on this Court by 42 U.S.C. § 1983.

2.2     Federal question jurisdiction is conferred on this Court by 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

2.3     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims for breach of contract and conversion because the claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

2.4     Venue is appropriate as all facts giving rise to Plaintiff's claims occurred within the Southern District of Texas, Houston Division.

## III.
### PARTIES

3.1     Plaintiff Gordon Carruth is an adult male citizen of Texas and the United States who resides in Harris County, Texas. At all times relevant to this action, Mr. Carruth was an employee of Defendant Lone Star College System.

3.2     Lone Star College System is a community college system organized and existing pursuant to the laws of the State of Texas for the purpose of operating a system of community colleges in and around Montgomery and Harris County, Texas. Defendant is located within the boundaries of the Southern District of Texas, Houston Division, and was Plaintiff's employer at all times relevant to this action. The College may be served with citation and service of process through its Chancellor, Dr. Stephen Head, at 5000 Research Forest Drive, The Woodlands, Texas 77381.

## IV.
### OVERVIEW OF EMPLOYMENT HISTORY

4.1     Mr. Carruth was hired by the College in August 1995.

4.2     At the time Mr. Carruth was hired, the College was named North Harris Montgomery Community College District—Montgomery College.

4.3     For almost 20 years, Plaintiff Gordon Carruth was employed by Lone Star College System ("College") as a professor.

4.4     During his employment with the College, Mr. Carruth taught courses in Computer Information Technology.

4.5     Mr. Carruth was a founding faculty member of the College.

3

4.6     For the entirety of his tenure at the College, Mr. Carruth taught classes at the Montgomery campus location.

4.7     Mr. Carruth loved his work and believed in the College and its mission of providing an affordable, quality education to a diverse student population.

4.8     College administrators and Mr. Carruth's peers acknowledged and honored his professional achievements and contributions. These included but were not limited to the following:

> 4.8.1     Mr. Carruth received the College's Faculty Excellence Award.
>
> 4.8.2     Mr. Carruth was appointed as the co-chair of the Texas Higher Education Coordinating Board's Tuning Texas Initiative in the field of Management Information Systems (MIS), which was created for the purpose of improving the quality of computer science/information technology instruction for students enrolled in Texas colleges.
>
> 4.8.3     Mr. Carruth was elected by his fellow faculty members to be the President of the Faculty Senate.
>
> 4.8.4     Mr. Carruth received the National Institute for Staff and Organizational Development Excellence Award.
>
> 4.8.5     Mr. Carruth received the College's Communication Award.

4.9     During his employment with the College, Mr. Carruth and the College executed a series of employment contracts.

4.10    The employment contracts that Mr. Carruth and the College entered into were each for a two-year duration.

4.11    Before the College renews a professor's contract, there is an evaluation process by which College administrators determine whether that professor is meeting the College's performance and conduct expectations.

4

4.12     The College does not renew the contract of a professor unless he is meeting the College's performance and conduct expectations.

4.13     College professors' contracts are not renewed without approval from the College's Board of Trustees.

4.14     When determining whether a professor is meeting the College's performance and conduct expectations, the criteria considered by the College include but are not necessarily limited to (1) whether the professor has complied with the established rules, policies and procedures of the College; (2) whether the professor has complied with federal and state law when performing his job duties for the College; and (3) whether the professor has conducted himself in a manner consistent with the College's values and overall mission to students and the public at large.

4.15     A College professor's contract is not renewed if the College determines that the professor has failed to meet one or more of the criteria referenced in paragraph 4.14 of this Complaint.

4.16     Each time the College evaluated Mr. Carruth in order to determine whether he was offered a new employment contract, the College elected to renew Mr. Carruth's employment contract.

4.17     Between 1995 and 2012, the College renewed Mr. Carruth's employment contract on at least 10 separate occasions.

4.18     Between 2004 and 2007, Mr. Carruth traveled with former College Dean Becky Gustamante and Ms. Gustamante's life-partner on at least 10 separate occasions, including more than one international trip. This travel was not work-related.

5

4.19     During the time period that Mr. Carruth traveled with Ms. Gustamante and her life-partner, Ms. Gustamante was employed by the College and was Mr. Carruth's immediate supervisor.

4.20     Between 2008 and 2011, Mr. Carruth continued to travel with Ms. Gustamante's life-partner, who was also Mr. Carruth's friend. During this time period, Ms. Gustamante was aware that Mr. Carruth and her life partner were traveling on vacations together but did not accompany them.

4.21     In July 2011, Mr. Carruth's supervisor, Becky Gustamente reprimanded Mr. Carruth for allegedly making inappropriate remarks toward female students. Ms. Gustamente refused to disclose the specific nature of the complaint.

4.22     In October 2011, Mr. Carruth's supervisor, Becky Gustamante wrote an update to the July 2011 reprimand stating that she had observed no more problems related to her July 2011 Letter of Reprimand and commended Mr. Carruth for making all the necessary changes.

4.23     On May 3, 2012, the College approved the renewal of Mr. Carruth's employment contract.

4.24     On May 4, 2012, Mr. Carruth received the Shining Star-Communication award, an honor bestowed by vote of faculty and staff of the College.

4.25     In August 2012, Mr. Carruth signed the employment contract that was offered to him by the College.

4.26     The employment contract that Mr. Carruth signed in August 2012 did not include any provision discussing termination for cause.

4.27     The employment contract that Mr. Carruth signed in August 2012 did not include any provision discussing termination without cause.

## V.
### ANN KIRCH AND THE CULTURE OF BULLYING, INTIMIDATION AND RETALIATION

5.1     In May 2011, Mr. Carruth was elected as Faculty Senate President for the College's Montgomery campus. He was elected by a vote of other faculty employed by the College.

5.2     In August 2011, Mr. Carruth began to meet weekly with College Vice President of Instruction Ann Kirch ("Dr. Kirch"), who had supervisory authority over the NASH, BELS, BASS, and TEAM Divisions. Mr. Carruth, as a faculty member, falls within the BASS Division. The meetings included discussions relating to Mr. Carruth's role as Faculty Senate President.

5.3     The acronym "NASH" refers to the Natural Science and Health professions, which includes Nursing, Chemistry, Biology, EMS, Biotechnology, etc.

5.4     Dr. Ron Dewlen is the former Dean of the NASH Division at the College's Montgomery campus.

5.5     In February 2012, the College removed Dr. Dewlen from his role as Dean of the NASH Division of the Montgomery campus.

5.6     Dr. Dewlen was removed from his role as Dean of the NASH Division of the College without prior notice, collaboration with or explanation to the Faculty Senate or the NASH Division.

5.7     In response to the removal of Dr. Dewlen from his role as Dean of the NASH

Division of the College, one professor wrote the following:

> Dr. Dewlen was a highly respected member of the NASH Division. His
> 'reassignment' came as a shock to us for a few reasons. First of all, leaving
> the division without a dean in the midst of the semester was an awful idea.
> Secondly, when questioned why Dr. Dewlen's sudden removal was
> necessary, Dr. Kirch refused to elaborate, citing privacy issues. Obviously,
> I respect a man's privacy, so I asked for more elaboration that would not
> violate his trust. Dr. Kirch simply told us that NASH was headed in the
> wrong direction and we needed to communicate better. I then explained
> that I like my job and do not want to suffer Dr. Dewlen's fate, could she
> please let me know what NASH was doing wrong so I would not commit
> that transgression. Dr. Kirch stared at me a few moments in what appeared
> to be a failed attempt at intimidation, then made it clear I should not
> question these decisions or any others made by the administration. I feel
> that when it is concerning my job, I do have a right to ask questions of the
> administration and expect truthful answers. (I have caught Dr. Kirch in lies,
> which is another matter. Trust is important between the faculty and
> administration).

5.8     Ann Kirch had input into the decision to remove Dr. Dewlen from his role

as Dean of the NASH Division of the College's Montgomery campus.

5.9     College President Austin Lane ("Dr. Lane") had input into the decision to

remove Dr. Dewlen from his role as Dean of the NASH Division of the College's

Montgomery campus.

5.10    College General Counsel Brian Nelson had input into the decision to

remove Dr. Dewlen from his role as Dean of the NASH Division of the College's

Montgomery campus.

5.11    College Chancellor Richard Carpenter had input into the decision to

remove Dr. Dewlen from his role as Dean of the NASH Division of the College's

Montgomery campus.

5.12    At the time the College removed Dr. Dewlen from his role as Dean of the NASH Division of the College's Montgomery campus, the College had not hired or designated a person to replace Dr. Dewlen (as Dean of the NASH Division).

5.13    Mr. Carruth had no input into the College's decision to remove Dr. Dewlen from his role as Dean of the NASH Division of the Montgomery campus.

5.14    During his employment with the College, Mr. Carruth never had supervisory authority over Dr. Dewlen.

5.15    During his employment with the College, Mr. Carruth's job responsibilities never included the power to alter the terms or conditions of Dr. Dewlen's role as Dean of the NASH Division of the Montgomery campus.

5.16    During his employment with the College, Mr. Carruth's job responsibilities never included the power to alter the terms or conditions of Dr. Dewlen's employment with the College.

5.17    After the College removed Dr. Dewlen from his role as Dean of the NASH Division of the Montgomery campus, Mr. Carruth verbally made his disagreement with this decision known to College President Austin Lane, Vice President of Instruction Ann Kirch and other College administrators.

5.18    On March 22, 2012, the College's Faculty Senate convened a meeting. During that meeting, a majority of those present voted in favor of delivering a letter to College administrators that discussed the need for "shared governance" (the "shared governance letter").

5.19     In the shared governance letter to College administrators, it was noted that shared governance "is a proven model for the effective management of academic institutions."

5.20     In the shared governance letter to College administrators, the Faculty Senate noted that "decisions regarding the possible reorganization of the Divisions and the supervision of faculty-led student organizations should be driven by a shared-governance process, thus ensuring an outcome that would more likely reflect the best interests of the College."

5.21     The shared governance letter to College administrators included the following excerpt:

> The shared governance model does not ensure that better decisions will always be made. It does, however, provide decisions with a legitimacy that is essential to creating mutual respect, increasing good will, and promoting communication between the faculty and administration. Such mutual respect is absolutely critical if LSC-Montgomery is to remain a premier academic institution. We all share the same goal: providing the best possible education to our students. This goal is best served when faculty and administrators work together with a shared vision and mutual respect.

5.22     Another professor wrote the following in response to Dr. Dewlen's forced departure:

> Things here in NASH have been very hard since Ron was fired. Mike Sundermann has tried to keep the Division meetings going, but Dr. Kirch has made it hard for him. I heard she really put him down over our discussions about needing a new dean. The problem is, we don't hear anything and then Dr. Kirch gets mad at us for not knowing. Last month she yelled at us for not knowing her plans for getting an interim. Well, she never told us! Maybe she told the chairs, but the chairs don't tell us anything either. The 'trusted chain of communication' is totally useless. Nobody knows anything about what's going on except that Dr. Kirch—and maybe the chairs—is really mad at our whole Division.

5.23     In the shared governance letter to College administrators, the Faculty Senate noted "four recent examples where the spirit of shared governance was not respected." These examples included the following:

> 5.23.1     Concerns about the selection process for the College's Vice President of Student Services;
>
> 5.23.2     Concerns about the selection process for the College's Vice President of Instruction;
>
> 5.23.3     Concerns about "the unilateral decision to discontinue the college newspaper";
>
> 5.23.4     The "consequences related to the removal of the NASH Dean"

5.24     Mr. Carruth delivered the shared governance letter to College President Austin Lane on March 22, 2012.

5.25     On March 23, 2012, Mr. Carruth, along with fellow College professors Larry Loomis-Price, Mark Stelter and John Kleist, spoke to College President Austin Lane and, during this discussion, expressed concerns about how Vice President of Instruction Ann Kirch handled certain faculty matters.

5.26     During the March 23, 2012 meeting with College President Austin Lane, Mr. Carruth and other professors told Mr. Lane that Vice President of Instruction Ann Kirch had an abrasive style of communicating. Mr. Lane agreed to speak to Dr. Kirch about her management style.

5.27     On April 10, 2012, Mr. Carruth met with Dr. Kirch.

5.28     On April 17, 2012, Mr. Carruth again met with Dr. Kirch and made an audio recording of their meeting.

11

5.29    As of April 17, 2012, there was no written rule in the Policy Manual that prohibited audio recordings of conversations that occurred at the College.

5.30    During meetings with Mr. Carruth, Dr. Kirch sometimes directed profane language at Mr. Carruth.

5.31    During meetings with Mr. Carruth, Dr. Kirch sometimes referred to Mr. Carruth as an "idiot."

5.32    During an April 17, 2012 meeting with Mr. Carruth, Dr. Kirch referred to Mr. Carruth as "stupid."

5.33    During an April 17, 2012 meeting with Mr. Carruth, Dr. Kirch compared Mr. Carruth to a "monkey in a cage."

5.34    During the April 17, 2012 meeting with Mr. Carruth, Dr. Kirch referred to Mr. Carruth as being "full of crap."

5.35    During an April 17, 2012 meeting with Mr. Carruth, Dr. Kirch compared Mr. Carruth to "boys," in reference to her teenage children.

5.36    Texas Penal Code § 16.02 permits a person to make an audio recording of a conversation with another person so long as at least one party to the conversation consents to being recorded.

5.37    On April 19, 2012, the Faculty Senate of the College passed a Resolution providing that College professors should not have to endure intimidation and threats by College administrators. The Resolution condemns "any intimidation, investigation, or threat by the [Lone Star] administration against representatives of the Faculty Senate for conducting Faculty Senate business."

5.38     On April 19, 2012, the Faculty Senate of the College passed a Resolution suggesting that Dr. Kirch and Dr. Lane propose a plan of action aimed at resolving the differences between College administrators and the College's Faculty Senate.

5.39     On April 20, 2012, the Faculty Senate of the College formally denounced certain actions taken by Dr. Kirch against Professors Carruth, Loomis-Price and Stelter by a vote of 38-1.

5.40     On April 20, 2012, Dr. Lane summoned Mr. Carruth to a meeting.

5.41     On April 20, 2012, Mr. Carruth and Dr. Lane had a one-on-one meeting.

5.42     During the April 20, 2012 meeting between Mr. Carruth and Dr. Lane, Mr. Carruth asked Dr. Lane to discuss the content of the April 17, 2012 audio recording of his meeting with Dr. Kirch.

5.43     During the April 20, 2012 meeting between Mr. Carruth and Dr. Lane, Dr. Lane refused to discuss the statements made by Dr. Kirch during her April 17, 2012 meeting with Mr. Carruth.

5.44     During the April 20, 2012 meeting between Mr. Carruth and Dr. Lane, Dr. Lane's only interest in the audio recording was to find out who advised Mr. Carruth to make an audio recording of his April 17, 2012 meeting with Dr. Kirch.

5.45     Dr. Larry Loomis-Price was employed by the College as a professor of Chemistry and Biotechnology. Dr. Loomis-Price is a graduate of MIT and The University of California at Berkeley.

5.46     During his employment with the College, Dr. Loomis-Price was a recipient of the Faculty Excellence Award and was selected by the College in 2011 to deliver the commencement ceremony speech.

5.47     On April 23, 2012, Dr. Loomis-Price filed a grievance with the College alleging gender discrimination and other bullying and intimidation by Dr. Kirch.

5.48     On April 24, 2012, Mr. Carruth met with Dr. Kirch. Also present during this meeting were Faculty Senate Vice President Barbara Eckenfels and Secretary Lori Hughes. Dr. Kirch did not speak during this meeting.

5.49     On April 25, 2012, Mr. Carruth filed a grievance with the College alleging gender discrimination and other bullying and intimidation by Dr. Kirch. Included in the grievance were the following:

> 5.49.1     Mr. Carruth's complaint that Dr. Kirch had engaged in unethical conduct that violated Lone Star College System Board Policy Manual ("Policy Manual") Section IV.D.3.01(e)(i);
>
> 5.49.2     Mr. Carruth's complaint that Dr. Kirch had engaged in unethical conduct that violated Policy Manual Section IV.D.3.01(e)(ii);
>
> 5.49.3     Mr. Carruth's complaint that Dr. Kirch had engaged in unethical conduct that violated Policy Manual Section IV.F.4.02;
>
> 5.49.4     Mr. Carruth's complaint that Dr. Kirch had engaged in unethical conduct that violated Policy Manual Section IV.F.4.05; and
>
> 5.49.5     Mr. Carruth's complaint that Dr. Kirch had engaged in unethical conduct that violated Policy Manual Section IV.F.4.06.

5.50     Mark Stelter is employed by the College as a professor of criminal justice.

5.51    Mr. Stelter holds a master's degree in theology from Liberty Baptist Theological Seminary and a Doctor of Jurisprudence degree from The University of Michigan Law School.

5.52    During his employment with the College, Mr. Stelter has twice won the Faculty Excellence Award.

5.53    On April 23, 2012, Mr. Stelter filed a grievance with the College alleging unethical conduct and a "pattern of intimidation and retaliation" by Dr. Kirch against himself, Mr. Carruth and Dr. Loomis-Price.

5.54    On April 25, 2012, Mr. Carruth delivered Faculty Senate Resolutions to Dr. Lane, and a meeting followed. Professors Mark Stelter, Craig Livingston and Rachael Phelps were present during the meeting.

5.55    On April 27, 2012, College General Counsel Brian Nelson wrote a letter to Mr. Carruth that acknowledged receipt of Mr. Carruth's grievance. In that letter, Mr. Nelson unilaterally decided to reclassify several of the specific issues about which Mr. Carruth filed his grievance, including Mr. Carruth's complaints about Dr. Kirch behaving unethically and in violation of policies in the Lone Star College System Board Policy Manual ("Policy Manual").

5.56    On April 27, 2012, Mr. Carruth received an email from Dr. Lane that invited him to sit at the President's Table at an upcoming gala fundraiser for the College.

5.57    On April 30, 2012, Mr. Carruth accepted Dr. Lane's invitation to sit at the President's Table at an upcoming gala fundraiser for the College.

5.58     On April 30, 2012, Mr. Carruth received an email from College General Counsel Brian Nelson. The email advised Mr. Carruth that he would be required to meet with an "outside investigator," along with Dr. Loomis-Price and Mr. Stelter.

5.59     The April 30, 2012 email from Mr. Nelson to Mr. Carruth did not inform Mr. Carruth of the identity of the "outside investigator."

5.60     Mr. Carruth was told by College administrators that the "outside investigator" would be "neutral" and would be interviewing Mr. Carruth for the purpose of investigating the substance of Mr. Carruth's grievance.

5.61     The April 30, 2012 email from Mr. Nelson to Mr. Carruth did not inform Mr. Carruth that the "outside investigator" he would be meeting with was Jacob M. Monty, who represents the College as a zealous advocate and was not acting as a neutral, impartial investigator when he investigated the allegations made by and against Mr. Carruth and the other grievants.

5.62     On May 1, 2012, Mr. Carruth met with Mr. Monty, who did not disclose that he was operating as the zealous advocate for the College.

5.63     During Mr. Carruth's May 1, 2012 meeting with Mr. Monty, the focus of Mr. Monty's investigation was not into the matters articulated in Mr. Carruth's grievance letter. Instead, Mr. Monty devoted the majority of the meeting time to asking Mr. Carruth questions about his prior interactions with female supervisors.

5.64     During Mr. Carruth's May 1, 2012 meeting with Mr. Monty, Mr. Monty devoted very little time or attention to Mr. Carruth's prior dealings with Dr. Kirch.

5.65    On May 1, 2012, the Faculty Senate Executive Board convened. A form entitled "Let Us Know" was distributed to the Faculty Senate.

The "Let Us Know" form included the following introductory language:

> In order to better understand and look into concerns/issues, we are asking for any example that you want to share. Please be as specific as you want. The more specific, the easier it will be to understand. If you want to put separate concerns/issues on separate pages, please do so. Please return this form or talk with your Division Faculty Senate Representative or Gordon Carruth. Gordon Carruth will be meeting with Dr. Lane to discuss these concerns and issues. They will be kept confidential between them.

5.66    Numerous faculty members responded to the "Let Us Know" form, some openly and others anonymously. Included in their written feedback were excerpts that illustrate the ongoing fear and intimidation caused by Dr. Kirch and the College administrators who refused to address or even acknowledge her pattern of mistreating College faculty:

5.66.1    That Dr. Kirch sent email that was "authoritarian, rude, and just plain mean"

5.66.2    That Dr. Kirch has used "intimidation tactics"

5.66.3    That Dr. Kirch has "belittled the entire department"

5.66.4    That Dr. Kirch "keeps telling everyone how STUPID they are and how STUPID their ideas are"

5.66.5    That Dr. Kirch "communicates with faculty really badly"

5.66.6    That Dr. Kirch's "assumption is always that we don't know anything"

5.66.7    That in an example of "classic Ann Kirch," Dr. Kirch announced to College faculty that any book buyers who came to campus would be "escorted off campus by police"

17

5.66.8    That Dr. Kirch threatened to have a professor arrested if the professor posted student grades on the wall, even if the posting was done anonymously

5.66.9    That Dr. Kirch told one professor "keep talking like that and you're going to find out how bad the job market really is"

5.66.10   That Dr. Kirch "regularly overplays her authoritarian hand by mentioning things like the police, being fired, etc."

5.66.11   That Dr. Kirch "hasn't been showing much impulse control"

5.66.12   That Dr. Kirch "asked her 'trusted' faculty to file grievances and reports with their Deans accusing Kirch's 'enemies' of creating a hostile work environment."

5.66.13   That Dr. Kirch often makes veiled threats during meetings such as "it is a pretty tough job market out there," and "I don't think anyone wants to be looking for a new job in this market," and "other not so subtle threats whenever a faculty member even makes a slight suggestion or comment that would indicate he or she may not be 'going along with Kirch's program.'"

5.66.14   That when a professor challenged Dr. Kirch regarding the direction of the academic department, Dr. Kirch replied "Well, then within 2 years everyone in the department will have to find new jobs."

5.66.15   That a person who was "afraid to put his name in writing" stated "in confidence" that he/she knew of colleagues who "feel physically sick when they come to work in the morning" because of their recent interactions with Dr. Kirch.

5.66.16   That a professor believed "that my job might be at risk" based on "Dr. Kirch's tone, language, and demeanor" when Dr. Kirch reprimanded that professor "in a very threatening way" while in the presence of that professor's peer.

5.66.17   That the College was involved in "extreme cases of academic bullying."

5.66.18   That after Dr. Kirch took over division meetings, they were "awful."

5.66.19      That during division meetings, Dr. Kirch shows "horrendously condescending slides" about "who we were supposed to trust and who we shouldn't speak to."

5.66.20      That Dr. Kirch treats faculty "like wayward children."

5.66.21      That a Dean is needed "just to have some reasonable person standing between us and her" (in reference to Dr. Kirch).

5.66.22      That "when faculty report to the administration (i.e. the college president) of this academic bullying (including but not limited to harassment, job-related threats, favoritism, unequal workloads, extortion, etc.), the administration takes a hands-off approach with absolutely no aid given or reports to the dean of what was reported to them which is a breach of confidentiality and leads to retaliation from the supervisor"

5.66.23      That College administrators "take part in" conduct that is "against the general counsel policy manual" which leaves "little the faculty can do about the problem"

5.66.24      That the College is "keeping bullying supervisors employed and unchecked"

5.66.25      That Dr. Kirch has exhibited a "contemptuous manner towards faculty"

5.66.26      That Dr. Kirch "attended one of our division meetings and decided to give us a little presentation concerning communication, stating 'Communications 101 students even know these things.'"

5.66.27      That "in the NASH Division meeting following our meeting with Dr. Lane, the VPI [Dr. Kirch] presented a tutorial on 'Communication 100' and gave us a quiz. I found this approach to be unprofessional and demeaning."

5.66.28      That Dr. Kirch "has treated the faculty with contempt"

5.66.29      That Dr. Kirch has stated "I don't have time for students"

5.66.30      That "I'm writing this for a colleague, who is too frightened to speak for himself. Dr. Kirch told this colleague that he needed to override the cap on a class. The colleague told her 'no, it wouldn't be safe.' I can't say why because it would give

away the person's identity, but I totally agree with him that safety was an issue. Dr. Kirch went TO HIS CLASS and took notes while he was teaching in an attempt to intimidate him into accepting her demand. Afterwards she told my colleague, 'I'm sure you'll agree that it would be safer to override the cap!'"

5.66.31   That Dr. Kirch is guilty of "creating a culture of fear"

5.66.32   That it is "sad how bad things have become at our campus"

5.66.33   That instead of working "*with* an administration," Dr. Kirch has created an environment in which professors work "*for* an administration" that attempts to "govern through fear and coercion"

5.66.34   That as a result of Dr. Kirch, those who voice opinions openly "will face retribution and possibly termination"

5.66.35   That "nobody wants to complain because we've all heard about the retaliation that's taking place if you dare go see the President"

5.66.36   That one professor's office mate was "too afraid to even file a complaint form"

5.66.37   That "everybody is afraid of retaliation these days"

5.66.38   That "when we have discussed the methods [Dr. Kirch] has proposed to our department with other groups or divisions, they act like it is new to them, as well. We all just feel lied to."

5.67   Until May 3, 2012, Mr. Carruth was regularly invited to and participated in monthly meetings with Faculty Senate Presidents, College Presidents and College Chancellor Richard Carpenter.

5.68   On May 3, 2012, Mr. Carruth received an email from Dr. Lane's administrative assistant advising him that the President's Table was full and that despite the prior invitation from Dr. Lane, Mr. Carruth would have to sit elsewhere if he attended the upcoming gala fundraiser for the College.

20

5.69     On May 7, 2012, Mr. Carruth wrote back to Mr. Nelson in response to Mr. Nelson's April 27, 2012 letter to reiterate his request that Mr. Nelson investigate all aspects of Mr. Carruth's grievance, including Dr. Kirch's violations of Policy Manual Sections IV.D.3.01, IV.F.4.02 and IV.F.4.06.

5.70     In his May 7, 2012 letter to Mr. Nelson, Mr. Carruth complained of retaliation by Dr. Kirch, in violation of Policy Manual Section IV.F.10.02, which prohibits certain types of retaliation.

5.71     On May 7, 2012, Mr. Carruth was uninvited from the monthly meetings between Faculty Senate Presidents, College Presidents and College Chancellor Richard Carpenter. This occurred just three hours before the lunch meeting was scheduled to begin, and the message was conveyed by Helen Clougherty, an administrative assistant to College Chancellor Richard Carpenter.

5.72     On May 9, 2012, Mr. Carruth was joined by Mark Stelter and Karen Buckman in a meeting with Dr. Lane. During this meeting, the three professors had hoped to show Dr. Lane some of the written criticism of Dr. Kirch, which was articulated in 19 different letters to College administrators. However, Dr. Lane refused to read the letters, since he claimed that 70 people had come to his office to say how much they liked Dr. Kirch.

5.73     On May 12, 2012, outside counsel for the College Jacob Monty mailed a "Memorandum" to the College (the "Memorandum"), Dr. Kirch, Mr. Carruth, Dr. Loomis-Price, Mr. Stelter, Chancellor Carpenter and College General Counsel Brian Nelson. However, the Memorandum was purportedly prepared not in Mr. Monty's

capacity as a zealous advocate of the College, but—ostensibly—in his capacity as the person performing a neutral "fact-finding investigation" into the grievances of Mr. Carruth, Mr. Stelter and Dr. Loomis-Price. Following are a few notable aspects of the Memorandum:

5.73.1    The Memorandum never specifically mentions any of the statements Dr. Kirch made in the audio recording of the April 17, 2012 meeting with Mr. Carruth. Instead, Mr. Monty summarily concludes that "there is no evidence that Kirch violated [College] Ethical Standards."

5.73.2    The Memorandum attributes statements to persons Mr. Monty never actually spoke to during the "investigation."

5.73.3    The Memorandum does not mention the examples of bullying, intimidation and misconduct by Dr. Kirch that were detailed in writing by faculty members in response to the "Let Us Know" form. Instead, he reasons that (1) Mr. Carruth only submitted 24 feedback forms from faculty that were critical of Dr. Kirch; (2) others must exist; and (3) those other comments—presumed to exist—"may arguably contain exculpatory evidence relating to Kirch." While this sounds like rank speculation, this conclusion is actually a demonstrably false sham that Mr. Carruth is eager to show the Court, the jurors, the media and anybody else who is interested in the kind of chicanery and deceit the College has willingly employed to cover up its wrongdoing.

5.73.4    Instead of inquiring into why it was that so many professors feared retaliation to a degree that led them to submit their Kirch-related complaints anonymously, the Memorandum instead discredits those professors' feedback.

5.73.5    While discrediting the written feedback of professors who were afraid to sign their name because of their express fear of retaliation, Mr. Monty supports his conclusion that Dr. Kirch did nothing unethical or unlawful with "evidence" such as the following: "Vice President Wendall Williams has known Kirch for 10 years and stated that Kirch has never displayed hostility toward men on account of their sex/gender. Further, Williams has never seen anyone complain of Kirch."

5.73.6　　Despite the obvious fact that the outcome of the "investigation" was planned long before Mr. Monty's first keystroke was typed, the Memorandum informs readers that "[n]o attempts to evade investigating the unethical behavior of Kirch or to exclude critical evidence were made during the course of the investigation."

5.74　　On May 16, 2012, Mr. Carruth and Dr. Loomis-Price each sent a letter to Mr. Nelson appealing the investigative decision of Mr. Monty. In their letters, both pointed out several errors in Mr. Monty's investigation. Dr. Loomis-Price urged the administration to ignore Mr. Monty's sham investigation and begin a "thorough and fair investigation" of his grievance. Losing hope in the integrity of the institution, Mr. Carruth wrote that "justice should be done in this matter, whether it is through this process or other avenues."

5.75　　In July 2012, Mr. Carruth emailed Dr. Lane to seek a meeting about not only his ongoing grievance against Dr. Kirch but also the grievances of Dr. Loomis-Price and Mr. Stelter. Although all three grievances had been addressed in a single memorandum prepared by Mr. Monty, Dr. Lane refused to meet with all three professors at once and simply stated that their grievances were closed. He further stated that he would only meet with them separately, and no representation would be allowed.

5.76　　On August 23, 2012, the Faculty Senate convened. During their meeting, they passed a vote of "No Confidence" against Dr. Kirch. This is an unusual development that typically occurs only when a College administrator demonstrates a pattern of inappropriate conduct that has harmed or threatens to harm the College and/or its students. Key points of emphasis include the following:

5.76.1     "Administration has had months to respond and has chosen not to respond."

5.76.2     "There are at least 7 faculty members in this room that are worried every day that they will be fired."

5.76.3     "Those that took motions, grievances, or met with Dr. Lane, did so in behalf of Faculty Senate, and are now being harassed."

5.76.4     "I think it's wrong to call anyone stupid and to swear at them. It is unprofessional."

5.77     On August 29, 2012, a newspaper article was published in *The Conroe Courier*. In that article, statements were attributed to Mr. Carruth that were critical of College administrators.

5.78     On September 6, 2012, Mr. Carruth, Kim Stelter and Dr. Loomis-Price attended the monthly Board of Trustees meeting. During the meeting, they separately addressed the Board to discuss ongoing problems with Dr. Kirch and campus administration.

5.79     On September 10, 2012, as both a defensive ploy and a retaliatory measure, Dr. Kirch alleges that Mr. Carruth, Mr. Stelter and Dr. Loomis-Price have discriminated against her because of her gender and caused her to suffer from a "hostile work environment."

5.80     On September 21, 2012, frustrated by the College's refusal to take legitimate corrective action, Mr. Carruth filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). In his EEOC Charge, Mr. Carruth alleges unlawful discrimination and retaliation.

5.81    On September 27, 2012, the Faculty Senate of the College approved two amendments. The first provides that the College's grievance process should be examined and strengthened. The second provides that a process should be adopted for conflicts between faculty members and College administrators that provides for resolution by an "impartial, trained mediator" who is "agreed upon by both parties."

5.82    On October 8, 2012, Mr. Monty publishes his second "Memorandum."

5.83    On page one of the October 8, 2012 Memorandum, Mr. Monty states that the College hired him to perform a "fact-finding investigation."

5.84    Mr. Monty's October 8, 2012 Memorandum is labeled "Confidential" and "Attorney-Client Privileged" but is also addressed to Mr. Carruth, Mr. Stelter and Dr. Loomis-Price, all of whom are cc: recipients of the letter and all of whom were adverse to Mr. Monty's client—the College—when Mr. Monty prepared the Memorandum.

5.85    In his October 8, 2012 Memorandum, Mr. Monty concludes that it is "highly probable" that Mr. Carruth harassed Dr. Kirch "on the basis of her gender." Because of this, Mr. Monty reasons that "it is imperative that Lone Star take some action to end the unrest and prevent further escalation." It is unclear whether this particular finding was made as investigator, counsel for the College or both.

5.86    Mr. Monty's conclusion that Mr. Carruth made Dr. Kirch's work environment "hostile" based on her gender was predicated on the following investigative findings:

>   5.86.1    Mr. Carruth's complaints that Dr. Kirch engaged in unethical, discriminatory conduct

5.86.2      Mr. Monty's finding that Mr. Carruth wanted to "spend time alone" with Dr. Kirch, even though Mr. Monty determined this to be a "stray remark" and therefore inadequate to support a claim of sex-based harassment

5.86.3      Dr. Kirch's claim that Mr. Carruth once told her he prefers women who wear "size 6" (an allegation Mr. Carruth categorically denies), even though Mr. Monty (operating as lawyer) determined this to be a "stray remark" and therefore inadequate to support a claim of sex-based harassment

5.86.4      Mr. Carruth's challenges regarding the job search process that culminated in Dr. Kirch's hiring

5.86.4      Mr. Monty's finding that Mr. Carruth was involved in "soliciting complaints" against Dr. Kirch (presumably by providing faculty with the "Let Us Know" form that resulted in near-unanimous feedback critical of Dr. Kirch by persons Mr. Monty elected not to interview during the investigation)

5.86.5      Mr. Carruth's recording and replaying of Dr. Kirch's own vitriolic words on an audio recording

5.86.6      The "no-confidence" vote involving Dr. Kirch, which is attributed to Mr. Carruth despite the fact that it was the result of a vote involving the entire Faculty Senate

5.86.7      Mr. Monty's finding that Mr. Carruth spoke to the newspapers about the "no confidence" vote

5.86.8      Mr. Monty's finding that Mr. Carruth refused to retract statements he made to the press

5.86.9      Accusing Dr. Kirch of harassment during a public meeting involving the College's Board of Trustees "based on issues that were investigated and closed"

5.87    Below are other notable aspects from Mr. Monty's October 8, 2012 Memorandum:

5.87.1      While the Memorandum refers to and relies upon Dr. Kirch's "15-page complaint to Lone Star College System" as evidence supporting Mr. Monty's investigative findings and legal

conclusions, Dr. Kirch's complaint was provided to neither Mr. Carruth nor the other grievants.

5.87.2    During his "investigation" into Dr. Kirch's claims, Mr. Monty did not interview anybody other than Dr. Kirch, Mr. Carruth, Mr. Stelter and Dr. Loomis-Price.

5.87.3    Mr. Monty devotes the majority of a page to his legal determination (apparently as investigator and lawyer for the College) that Mr. Carruth had an unlawful motive to harass Dr. Kirch based on gender. The logical progression of this conclusion is as follows (detailed on page 15 of the Memorandum): (1) "those interviewed" (no specific interviewees are identified) indicated that Carruth "has issues with women in a professional setting;" (2) female students complained about Carruth (during the 18-year period in which the College renewed his contract a dozen times and repeatedly commended him); (3) Mr. Carruth "treats women condescendingly and males collegially" (even though his boss, a female, routinely traveled with him around the world outside of work); (4) Mr. Carruth is "very flirty with women" until they "contradict him or fail to go along with his agenda" after which time he becomes "a different person altogether;" and (5) Mr. Carruth would "not have such animosity against Kirch if Kirch were a man."

5.87.4    Mr. Monty never discusses the possibility that the strained relationship between Dr. Kirch and Mr. Carruth might be attributable to the indisputable audio evidence that Dr. Kirch referred to him as "stupid," "idiot," "monkey" and other derogatory, insulting labels. Likewise, Mr. Monty did not expressly refer to the written feedback of other faculty members who chronicled their own abusive, condescending encounters with Dr. Kirch.

5.88    Among the most illustrative portions of the October 8, 2012 Memorandum is Mr. Monty's discussion of the facts that led him to believe that Dr. Kirch's environment was sexually hostile. The following rhetorical misfire from the Monty Memorandum

somehow equates the existence a Constitutionally-protected campus club to sex-based

harassment by Mr. Carruth. Here is the specious excerpt from the Memorandum:

> Kirch stated that her workplace has become an environment permeated with intimidation. Kirch also stated that she is in fear for her safety due to an active "Second Amendment Club" on campus, which promotes policy change to allow concealed weapons at [Lone Star College System]. Kirch stated that some individuals who are active in voicing their issues with her are either friendly with members of the Second Amendment Club or actively involved with the Second Amendment Club. In a hostile work environment gender discrimination claim, the alleged victim has the burden of proving discriminatory intimidation, ridicule and insult by a combination of an objective and subjective standard, under which the inquiry is whether a reasonable person in Kirch's shoes would share Kirch's apprehension. The fear and intimidation Kirch expresses based on the promotion of firearms in an environment where she is prominently disdained may support finding that Kirch's complaint meets the fourth element of gender-based hostile work environment.

5.89   On October 9, 2012, Mr. Carruth was summoned from the class he was

teaching and taken to Dr. Lane's office, where he was summarily fired. Dr. Lane expressly

attributed the firing to the October 8, 2012 Memorandum prepared by Mr. Monty.

5.90   In the letter that summarizes the basis for Mr. Carruth's firing (and turns

the law on its head), Dr. Lane expressly states that Mr. Carruth's complaints about Dr.

Kirch's unethical and unlawful conduct created a hostile work environment for Dr. Kirch.

Specifically, Dr. Lane notes that one reason the College fired Mr. Carruth was because he

made "continual assertions that Dr. Kirch was involved in unethical and discriminatory

conduct despite these charges being fully investigated and closed."

5.91   As they fired Mr. Carruth, College administrators told him that he would

be arrested if he failed to leave the campus within 30 minutes.

5.92    As Mr. Carruth attempted to locate and pack what he could, he was observed by a police officer that had been summoned by College administrators.

5.93    During the time period provided to him by the College within which to leave the campus or be arrested, Mr. Carruth was unable to collect all of his personal belongings.

5.94    Between October 9, 2012 and the present, Mr. Carruth has written to the College repeatedly in an effort to have his personal belongings returned, both directly and through counsel.

5.95    The College has yet to return all of Mr. Carruth's personal belongings.

5.96    On October 9, 2012, the College reassigned Dr. Loomis-Price to another College campus over his objection. This transfer violated the College's Policy Manual.

5.97    The College's stated reason for transferring Dr. Loomis-Price to another campus was to "eliminate any harassment" of Dr. Kirch. Thus, just as it did with Mr. Carruth, the College elected to punish the victim and insulate the bad actor that created the problem to begin with.

5.98    Although Dr. Loomis-Price teaches biotechnology, the campus to which he was reassigned does not have a biotechnology program.

5.99    Dr. Loomis-Price's reassignment required him to endure a significantly longer commute to and from work each day, which resulted in family hardship.

5.100   On October 19, 2012, Dr. Loomis-Price filed a grievance against the College, claiming that his forced transfer was arbitrary, capricious and in violation of the Policy Manual.

5.101   At the time of Dr. Loomis-Price's involuntary transfer, Board Policy IV.F.10.10 required grievants to provide a "concise statement that explains the specific complaint" about which the grievance was filed.

5.102   Although Mr. Loomis-Price articulated the reasons for his grievance regarding the involuntary transfer, the College neither permitted nor denied the grievance. Instead, the College wrote back on November 12, 2012 to advise Dr. Loomis-Price the he had "failed to demonstrate factually" that his involuntary reassignment was "retaliatory in nature."

5.103   The College's true reason for transferring Dr. Loomis-Price to another campus against his will was to force him to resign. It worked, as Dr. Loomis-Price ultimately found the conditions surrounding his transfer to be so intolerable for him and his family that he resigned.

## VI.
### FIRST CAUSE OF ACTION: FIRST AMENDMENT RETALIATION: 42 U.S.C. § 1983; US CONSTITUTION, FIRST AMENDMENT

6.1   Mr. Carruth incorporates all preceding paragraphs by reference.

6.2   Employees of governmental entities are entitled to the protection of law when they speak as citizens on matters on matters of public concern.

6.3   During his employment with the College, Mr. Carruth spoke as a citizen about matters of public concern, including but not limited to the following:

6.3.1   The overall leadership structure of the College

6.3.2   College administrators' decision to get rid of the campus newspaper

6.3.3   The communication dynamics between College administrators and faculty

6.3.4   The process by which College administrators were vetted and hired

6.3.5   The process by which grievances were investigated and addressed

6.3.6   The persons involved in investigating grievances and whether such persons were neutral or aligned with the College

6.3.7   The employment situations of other College employees that Mr. Carruth did not supervise

6.3.8   The mistreatment of other College employees by Dr. Kirch and College administrators

6.3.9   The process by which Dr. Dewlen was involuntarily removed from his position as Dean of the NASH Division

6.3.10  The College's adherence to and interpretation of its own rules, policies and procedures during a grievance

6.3.11  Statements to third parties that amounted to expressions of opinion regarding policy that were outside the scope of his job duties

6.3.12  The shared governance business model and its proven utility and efficacy within the realm of higher education

6.3.13  The refusal to allow Mr. Carruth to be represented during meetings with College administrators.

6.4   Prior to his firing, some of the matters about which Mr. Carruth spoke were unrelated to his employment duties.

6.5   Prior to his firing, some of the matters about which Mr. Carruth spoke were outside the scope of his employment duties.

6.6   Prior to his firing, some of the matters about which Mr. Carruth spoke concerned his employment duties but were not ordinarily within the scope of his employment duties.

31

6.7    Mr. Carruth's protected free speech was of the variety that is critical to the proper functioning of the College and the restoration of efficiency, honesty, and integrity critical to the proper functioning of government.

6.8    Mr. Carruth's exercise of protected First Amendment rights was a substantial or motivating factor in the College's decision to terminate him.

6.9    The College intentionally engaged in unlawful employment practices involving Mr. Carruth by retaliating against Mr. Carruth because he engaged in speech protected by the laws of the United States.

6.10    The College's firing of Mr. Carruth violated his rights under the United States Constitution.

6.11    When subjecting Mr. Carruth to adverse employment action including but not limited to his firing, College officials and employees acted under color of state law.

6.12    When subjecting Mr. Carruth to adverse employment action including but not limited to his firing, College officials acted pursuant to a custom, policy or practice of taking adverse actions against employees without regard to or compliance with employees' constitutionally protected rights or the College's own internal rules and procedures.

6.13    Mr. Carruth's interest in engaging in the protected speech he engaged in far outweighed the College's interest in promoting efficiency.

6.14    The actions taken by the College in contravention of Mr. Carruth's protected free speech were not calculated to and did not in fact promote the efficient operation of the College.

32

6.15    The decision to fire Mr. Carruth was made at the highest levels of College administration.

6.16    The following persons provided input into the decision to fire Mr. Carruth:

      6.16.1  Dr. Austin Lane, College President

      6.16.2  Dr. Richard Carpenter, former College Chancellor

      6.16.3  Dr. Ann Kirch, Vice President of Instruction

      6.16.4  Ms. Becky Gustamante, Dean of BASS Division

      6.16.5  Other College administrators not named in paragraphs 6.10.1, 6.10.2, 6.10.3 and 6.10.4 of this Complaint.

6.17    The above-described acts and omissions of the College proximately and legally caused Mr. Carruth to suffer damages for which he now seeks recovery of damages and other equitable remedies to which he is legally entitled.

6.18    Mr. Carruth has been required to engage the services of an attorney to bring this claim and seek recovery of reasonable and necessary attorney's fees and taxable costs.

## VII.
### SECOND CAUSE OF ACTION: VIOLATION OF THE DUE PROCESS CLAUSE
### 42 U.S.C. § 1983; US CONSTITUTION, FOURTEENTH AMENDMENT

7.1    Mr. Carruth incorporates all preceding paragraphs by reference.

7.2    The College has certain grievance procedures that are set forth within the Policy Manual.

7.3    The College did not adhere to its own internal grievance procedures when it investigated Mr. Carruth's grievance and then fired him during the pendency of his grievance.

7.4     The policies within the Policy Manual that the College failed to adhere to during Mr. Carruth's grievance and termination include but are not limited to Policies IV.F.4.08, IV.F.10.01, IV.F.10.06, IV.F.10.10, IV.F.10.11, IV.F.10.12 and IV.F.10.13.

7.5     In particular, the College failed to comply with one or more of the above-referenced Policies when the College refused to discuss the findings relating to Mr. Carruth's April 25, 2012 grievance.

7.6     While Mr. Carruth's grievance specifically identified the rules, policies and procedures that the College violated, the College unilaterally and without regard to its internal rules or the law elected to recharacterize and then not investigate some of the violations encompassed by Mr. Carruth's grievance.

7.7     When Mr. Carruth challenged the College's refusal to investigate certain issues about which Mr. Carruth grieved in accordance with expressly mentioned Board Policy, Mr. Carruth persisted. However, despite being given opportunities to remedy its prior violations of Mr. Carruth's due process rights, the College willfully and repeatedly failed to do so.

7.8     The College did not provide Mr. Carruth with a grievance hearing until after his employment was terminated.

7.9     The College's failure to adhere to its own grievance procedures violates the due process clause of the United States Constitution by depriving Mr. Carruth the due process to which he was legally entitled.

34

7.10    The above-described acts and omissions of the College proximately and legally caused Mr. Carruth to suffer damages for which he now seeks recovery of damages and other equitable remedies to which he is legally entitled.

7.11    Because Mr. Carruth was employed pursuant to an employment contract, he had a property interest in his continued employment with the College.

7.12    Mr. Carruth has been required to engage the services of an attorney to bring this claim and seek recovery of reasonable and necessary attorney's fees and taxable costs.

## VIII.
### THIRD CAUSE OF ACTION: BREACH OF CONTRACT

8.1    Plaintiff incorporates all preceding paragraphs herein by reference.

8.2    At the time of his termination, Mr. Carruth was employed by the College pursuant to a two-year contract of employment.

8.3    A protected property interest in employment exists when the employee has a legitimate claim of entitlement to it.

8.4    A contract is a protected property interest.

8.5    The College terminated Mr. Carruth without good cause, in violation of the express and implied terms of the employment contract.

8.6    Mr. Carruth has been damaged by the College's breach of his employment contract and now seeks to recover all damages to which he is legally entitled as a result, including but not limited to the benefits conferred upon him by the contract and all other legal and equitable relief to which he is entitled as a consequence of the College's breach of this employment contract.

## IX.
### FOURTH CAUSE OF ACTION: CONVERSION

9.1     Plaintiff incorporates all preceding paragraphs herein by reference.

9.2     After firing Mr. Carruth, the College kept some of his personal belongings. The personal items the College has refused to return include but are not limited to the following:

    9.2.1   All of Mr. Carruth's personal files, which were located in College's filing cabinets on the date Mr. Carruth was fired

    9.2.2   Desktop file holders and their contents

    9.2.3   A 3-hole punch

    9.2.4   DOS and Microsoft Windows videos that belong to Mr. Carruth

    9.2.5   Large laminated poster of the world

    9.2.6   A round, 5' tall, hard-plastic black tube with white screw-on lid that can hold a laminated poster

    9.2.7   A small, black USB-based Webcam that was mounted on top of double-monitors

    9.2.8   Linksys Gigabit 8-Port Workgroup Switch, Model #EG008W

    9.2.9   Two (2) Viewsonic 20" computer monitors mounted on a double-pedestal, Model #VLCDS26064-2W and associated cables: Serial #: A21042000700 and Serial #: A21042400642

    9.2.10  A label maker in a small tan case

    9.2.11  Several video cameras (each in a box) that could be used in a surveillance system for a home or office

    9.2.12  Power supply equipment for the above-referenced cameras

    9.2.13  An expansion card that plugs into a computer for connection to the cameras in order to turn a computer into a monitoring station

    9.2.14  A large box containing connectors, wires, and numerous other items.

9.3     Mr. Carruth repeatedly asked for the College to return his personal belongings, but the College refused to do so despite ample opportunity.

9.4     The tort of conversion occurs when (1) the plaintiff owned, had legal possession of, or was entitled to possession of the subject property; (2) the defendant unlawfully and without authorization assumed and exercised control over the property, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused to return the property.

9.5     Mr. Carruth has been damaged by the College's unlawful retention of his personal property and seeks all damages to which he is entitled as a consequence of same.

## X.
### JURY DEMAND

10.1    Plaintiff hereby demands a trial by jury.

## XI.
### PRAYER

11.1    Plaintiff Gordon Carruth seeks the following damages and other relief:

a)   Actual damages;

b)   All benefits to which he was entitled pursuant to the employment contract to which Mr. Carruth and Lone Star were parties;

c)   Past and future lost wages, benefits, and other emoluments of employment;

d)   Other future damages authorized by law;

e)   Pre-judgment interest as permitted by law;

f)   Post-judgment interest as permitted by law;

g)   Injunctive relief as permitted by law, including but not limited to reinstatement;

h) All other damages to which he is lawfully entitled, in addition to those specified above;

i) Reasonable and necessary attorney's fees, including appellate fees; and

j) Taxable costs of court.

Respectfully submitted,
MINCES PLLC

By:    /s/ David M. Minces
     **David M. Minces**
     Federal I.D. No.: 435389
     State Bar No.: 24026880
     Email:david.minces@mincespllc.com
     **MINCES PLLC**
     808 Travis Street, Suite 1450
     Houston, Texas 77002
     Telephone: (713) 595-9675
     Facsimile: (713) 583-9795

**ATTORNEY-IN-CHARGE FOR PLAINTIFF**

OF COUNSEL:

**Francisco J. Caycedo**
Federal I.D. No.:  36976
State Bar No. 24040664
Email:  frank.caycedo@mincespllc.com

**MINCES PLLC**
808 Travis Street, Suite 1450
Houston, Texas 77002
Telephone: (713) 595-9675
Facsimile: (713) 583-9795